IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| Roxanne Talent,<br><br>　　　　　　　　Plaintiff,<br><br><br><br>　　　vs.<br><br>Commissioner of Public Works d/b/a<br>Charleston Water System,<br><br>　　　　　　　　Defendants. | Civil Action No. 2:12-622-DCN-BHH<br><br>**REPORT AND RECOMMENDATION**<br>**OF MAGISTRATE JUDGE** |

This matter is before the Court on the defendant's motion for summary judgment. [Doc. 34], pursuant to Federal Rules of Civil Procedure 56. In her Complaint, the plaintiff alleges claims pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq*.

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Rule 73.02(B)(2)(g), D.S.C., all pretrial matters in employment cases are referred to a United States Magistrate Judge for consideration.

## FACTUAL BACKGROUND

The defendant is a public water and wastewater utility that provides clean water services to the Greater Charleston Community. (Compl. ¶ 2). The plaintiff is a Caucasian female who worked for the defendant in various capacities and departments between 1982 and 2010. (Pl. Dep. at 14-15.)

In 2003, the plaintiff was transferred to the Customer Service Department, where she remained until her termination. (Pl. Dep. at 31-32, 37–38, 83.) The plaintiff's supervisor from mid-2005 to 2008 was Barbara Wrench, a Caucasian female. (Pl. Dep. at 31.) On November 14, 2007, Wrench issued a 5-day suspension to the plaintiff for unacceptable

quality, lack of professionalism, malicious statements about the defendant, giving non-related, unnecessary information, and two documented incidents of improper customer call handling.  (Def. Ex. E; see also Pl. Dep. at 148-49; 171–72.)

In 2008, the plaintiff transferred to the North Area Branch, where her primary function was processing payments. She received the same pay and benefits, and her job responsibilities overlapped her former responsibilities at the call center, with the addition of processing payments.  (Pl. Dep. at 46–48; 53–54; 176–177.)

Upon her transfer to the North Area Branch, the plaintiff's supervisor was Karen Mullen Mitchell, an African-American female. (Pl. Dep. at 32.) It is alleged that the plaintiff's work deficiencies continued after her transfer to the North Area Branch. (See Def. Ex. B, E & F.)  On February 8, 2010, the plaintiff was given a developmental plan by her supervisor as an additional measure to help improve her performance. (Def. Ex. K).  The plaintiff allegedly continued to struggle with work performance in various ways.  The Court will describe some of the allegations against her in greater detail *infra*.

In total, in the six months after the plaintiff was placed on a developmental plan to help improve her performance, she was counseled at least six times for failing to follow proper procedure, many of which were directly related to the mishandling of customer payments. Additionally, she was coached and counseled regarding her general performance and was given SMART goals and improvement opportunities, but allegedly failed to improve her performance as required.

By letter dated August 12, 2010, Evelyn Ferguson, CWS's Director of Customer Service, terminated the plaintiff. (Def. Ex. B) The four-page termination letter outlined a long history of documented performance problems that allegedly justified in her termination. *Id*.  On June 15, 2011, the plaintiff filed a Charge of Discrimination ("Charge") with the Equal Employment Opportunity Commission ("EEOC"), alleging race discrimination. (Def. Ex. C.) On March 2, 2012, the plaintiff filed this action in federal court, alleging that the defendant

2

discriminated against her in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") because of her Caucasian race. (See Compl).

## APPLICABLE LAW

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or  "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to judgment as a matter of law.  As to the first of these determinations, a fact is deemed "material" if proof of its existence or non-existence would affect disposition of the case under applicable law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant.  *Id.* at 257.  In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party.  *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

3

Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

## DISCUSSION

### I.    Time Barred Allegations

The defendant first contends that the plaintiff's claims are time barred for not having occurred within 300 days of the filing of her administrative Charge with the Equal Employment Opportunity Commission ("EEOC").

It is true that before filing suit under Title VII, a plaintiff must first exhaust her administrative remedies by bringing a timely charge of discrimination with the EEOC. *See* 42 U.S.C. § 2000e-5(e)*; Gilliam v. S.C. Dep't of Juvenile Justice*, 474 F.3d 134, 139 (4th Cir. 2007); *Smith v. First Union Nat. Bank*, 202 F.3d 234, 247 (4th Cir. 2000). Title VII establishes two possible limitation periods for filing a discrimination charge with the EEOC. *See* 42 U.S.C. § 2000e-5(e)(1) (Title VII); 29 U.S.C. § 626(d)(1) (ADEA). The standard limitations period for filing a charge is 180 days after the alleged unlawful employment practice. *Id*. The limitations period is extended to 300 days, however, when state law proscribes the alleged employment practice and the charge has initially been filed with a state or local deferral agency. *See* 42 U.S.C. §2000e-5(e)(1); 29 U.S.C. § 626(d)(1)(B).

However, "when the relevant state agency has entered into a work sharing agreement with the EEOC and that agreement states that each agency will serve as the agent of the other for the purpose of receiving charges, it is well-settled law that a charge

4

filed with the EEOC is 'constructively filed' with the state agency either on the same day that the charge was filed with the EEOC or on the day that the EEOC refers the complaint to the state agency." *Peterson v. State of Cal. Dept. of Corrections and Rehabilitation*, 319 Fed. Appx. 679, 680 (9th Cir. 2009) *(quoting* EEOC v. Commercial Office Products Co.*, 486 U.S. 107, 112-113, 125 (1988) (holding that the 300-day federal limitations period applied to a claim that the plaintiff filed only with the EEOC 290 days after the discriminatory act, and stating that "[t]he EEOC's referral of a charge initially filed with the EEOC to the appropriate state or local agency properly institutes the agency's proceedings within the meaning of the Act"); *Puryear v. County of Roanoke*, 214 F.3d 514, 519 (4th Cir. 2000).

This District has traditionally assumed, without requiring proof, the existence of such a workshare agreement between South Carolina and the EEOC. *See Brown v. Berkeley County School Dist.*, 339 F.Supp.2d 715, 721 n.3 (D.S.C.2004); *Grooms v. Mobay Chem. Corp.*, 861 F. Supp. 497, 503 & n. 7 (D.S.C.1991). Accordingly, the 300-day limitations period was implicated by virtue of any EEOC filing, pursuant to the operative worksharing agreement.

And, as the defendant contends, a plaintiff's failure to file a charge within the applicable limitations period bars a later lawsuit in federal court. *See McCullough v. Branch Banking & Trust Co.*, 35 F.3d 127, 131 (4th Cir. 1994) ("When the plaintiff fails to file such a complaint in a timely fashion with the EEOC, the claim is time-barred in federal court.") The plaintiff alleges that she was discriminated against on August 12, 2010, when her employment was terminated. (Def. Ex. C.) She did not, however, file her EEOC Charge of Discrimination until June 15, 2011, some 307 days after the alleged unlawful employment practice. (Def. Ex. C.) Accordingly, the defendant argues that her claim should be dismissed.

The plaintiff responds that any technical tardiness was the result of delay by the South Carolina Human Affairs Commission in processing her intake questionnaire, filed on

September 3, 2010.   The plaintiff claims that she did not receive a copy of her Charge of Discrimination until June 8, 2011, at which time she had ten days to sign and return; she filed the Charge, on June 15, 2011.  (Pl. Dep. Ex. 1.)

An EEOC intake questionnaire under certain circumstances can satisfy a plaintiff's obligation to timely file a charge of discrimination.  *Federal Express Corp. v. Holowecki*, 552 U.S. 389, 395- 402 (2008).  The Supreme Court, in *Holowecki*, held, "In addition to the information required  by the regulations, i.e., an allegation and the name of the charged party, if a filing is to be deemed a charge it must be reasonably construed as a request for the agency to take remedial action to protect the employee's rights or otherwise settle a dispute between the employer and the employee."  *Id*. at 402.

The plaintiff's completed intake form contained all of the information required by regulation for a Charge, as outlined in 29 CFR § 1626.8, including the employee's name, address, and telephone number, as well as those of her employer; an allegation that she and other employees had been the victims of "race discrimination"; the number of employees who worked for the employer; and a statement indicating she had not sought the assistance of any government agency regarding this matter.  *See Holowecki*, 552 U.S. at 404.  But, critically, at the end of the questionnaire, the plaintiff requested "[a]ny and all available [relief] under the law."  (Pl. Ex. C at 17.)  This kind of language is properly construed as a request for the agency to act.  *See Holowecki*, 552 U.S. at 405.

The defendant has not really addressed the intake questionnaire, in light of *Holowecki,* either in the first instance or on reply.  The Court would recommend that the plaintiff be considered to have filed a timely Charge of Discrimination, therefore.

## II.    Exhaustion

The defendant also claims that the plaintiff's retaliation claim should be dismissed, insofar as it was not exhausted.  The plaintiff resists.  But, as far as the Court can tell, the plaintiff has not pled any retaliation claim in her Complaint. (See generally Compl.) The

word does not appear.  In a single, generalized averment, the word "retaliatory" appears once.  *Id*. ¶ 8.  There is no captioned cause of action styled as one in retaliation.  All of the averments, sound in discriminatory conduct.  But, because the parties have presumed it, the Court would say more.

As the defendant emphasizes, the scope of a charge of discrimination limits the scope of any subsequent litigation; claims not included in the charge of discrimination are barred from judicial review.  *See Chacko v. Patuxent Inst*., 429 F.3d 505, 509, 513 (4th Cir. 2005); *Evans v. Techs. Apps. & Serv. Co.*, 80 F.3d 954, 963-64 (4th Cir. 1996) ("Only those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII lawsuit."); *see also Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 132 (4th Cir. 2002).

The plaintiff, here, plainly did not include any allegations relating to retaliation in her Charge of Discrimination.  (Def. Ex. C.)  The charge never identified any protected activity of the plaintiff or any specifically retaliatory conduct for the same.  And, even though represented by counsel, the plaintiff never timely amended her Charge to include a retaliation accusation.  In her Charge, she was expressly invited to check boxes regarding the basis for her claims and she elected race only, even where retalation was plainly available.  (Def. Ex. C.)   Likewise, the plaintiff made the identical election on her Intake Questionnaire.  (See Pl. Ex. C at 5.)

The plaintiff argues that some allegations of retaliation were included in the intake questionnaire.  Even if the Court were to accept this characterization, the Fourth Circuit has recently reiterated that the Charge of Discrimination represents the limits of any subsequent lawsuit.  *See Balas v. Huntington Ingalls Indus., Inc.*, 711 F.3d 401, 408 (4th Cir. March 15, 2013).  The allegations of the intake questionnaire cannot save it.

Accordingly, any perceivable retaliation claim in the Complaint should not be considered now and should be dismissed.

## III.   Race Discrimination

As stated, the plaintiff contends that her employment was terminated on account of her race in violation of Title VII.  The Fourth Circuit has explained, a Title VII plaintiff may "avert summary judgment . . . through two avenues of proof." *Diamond v. Colonial Life & Acc. Ins. Co.*,  416 F.3d 310, 318 (4th Cir. 2005) (quoting *Hill v. Lockheed Martin Logistics Management, Inc.*, 354 F.3d 277, 284 (4th Cir. 2004) (emphasis added).  A plaintiff can survive a motion for summary judgment by presenting direct or circumstantial evidence that raises a genuine issue of material fact as to whether an impermissible factor such as race motivated the employer's adverse employment decision. *Diamond*, 416 F.3d at 318. Pursuant to the 1991 Act, the impermissible factor need not have been the sole factor. As long as it motivated the adverse action, the plaintiff can establish an unlawful employment practice. *See* 42 U.S.C.A. § 2000e-2(m). Alternatively, a plaintiff may "proceed under [the McDonnell Douglas ] 'pretext' framework, under which the employee, after establishing a prima facie case of discrimination, demonstrates that the employer's proffered permissible reason for taking an adverse employment action is actually a pretext for discrimination." *Hill*, 354 F.3d at 285.  The plaintiff has not offered that she has any direct evidence.

*McDonnell Douglas* requires that an employee first prove a *prima facie* case of discrimination by a preponderance of the evidence. If he succeeds, the employer has an opportunity to present a legitimate, nondiscriminatory reason for its employment action.  If the employer does so, the presumption of unlawful discrimination created by the *prima facie* case drops out of the picture, and the burden shifts back to the employee to show that the given reason was just a pretext for discrimination.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973).

In *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), the Supreme Court reiterated that evidence of pretext, combined with the plaintiff's *prima facie* case, does not compel judgment for the plaintiff, because " [i]t is not enough . . . to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination." *Id.* at 147 (citation omitted). However, the Court also stated that, under the appropriate circumstances, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* It is the plaintiff's burden to create an inference that the defendant's proffered reason is a pretext for intentional discrimination. *See id.* at 147-48. Pretext analysis does not convert Title VII into a vehicle for challenging unfair--but nondiscriminatory--employment decisions. *Holder v. City of Raleigh*, 867 F.2d 823, 828 (4th Cir.1989). Conclusory allegations, without more, are insufficient to preclude the granting of the defendant's summary judgment motion. *See Ross* v. *Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985) *abrogated on other grounds by Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989).

### *Prima Facie* Case

To establish a *prima facie* case of discriminatory discharge, the plaintiff must show: (1) that she is a member of a protected class; (2) that she suffered from an adverse employment action; (3) that at the time the employer took the adverse employment action she was performing at a level that met her employer's legitimate expectations; and (4) other employees who are not members of the protected class were retained under apparently similar circumstances. *See Bryant v. Bell Atlantic Maryland, Inc.*, 288 F.3d 124, 133 (4th Cir.2002). The defendant effectively contends that the plaintiff cannot establish the third or fourth elements of her *prima facie* case.

"The precise requirements of a prima facie case can vary depending on the context and were never intended to be rigid, mechanized, or ritualistic." *Swierkiewicz v. Sorema*

9

*N. A.*, 534 U.S. 506, 512 (U.S. 2002) (quotations omitted).  Although other evidence might suffice, the Court is generally open to evidence that similarly situated employees outside the protected class received more favorable treatment.  *See White v. BFI Waste Servs.*, LLC, 375 F.3d 288, 295 (4th Cir. 2004).

The defendant argues that the plaintiff cannot satisfy the third element of her *prima facie* case that she was meeting the legitimate performance expectations of her employer. Specifically, the defendant emphasizes the following evidence of performance deficiencies. As stated, on November 14, 2007, Barbara Wrench, the plaintiff's supervisor, issued a 5-day suspension to the plaintiff for unacceptable quality, lack of professionalism, malicious statements about the defendant, giving non-related, unnecessary information, and two documented incidents of improper customer call handling.  (Def. Ex. E; Pl. Dep. at 148-49; 171-72.) Apparently, in processing payments, the plaintiff was required to complete specific forms regarding cash transactions.  The plaintiff admits to committing some such errors in processing payments and in handling cash transactions. (Pl. Dep. at 48-52.)  Additionally, the plaintiff concedes that her performance review, for the period 11/1/08– 10/31/09, noted her work deficiencies under her SMART goals. (See Def. Ex. G; Talent, 84–87; 88–89).  In August 2008, the plaintiff received a "meets expectations" on her performance review.  (Def. Ex. H.)  In October 2008, however, the plaintiff received a did "not fully meet high expectations" on her review. (Def. Ex. I.)  And, in November 2009, the plaintiff received a "did not meet expectations" on her performance review; her deficiencies included numerous account and cash handling errors.  (Def. Ex. J.)

On February 8, 2010, the plaintiff was given a developmental plan by her supervisor as an additional measure to help improve her performance.  (Def. Ex. K.)  On March 11, 2010, the defendant additionally discovered through an audit that the plaintiff mishandled funds. (Def. Ex. L.)  Specifically, the plaintiff failed to credit a customer's account and instead credited her own personal account for the identical amount, and only reported it

when the customer returned to inquire into the matter. *Id*. On March 29, 2010, the plaintiff changed a Federal ID number on an account without the proper documentation, in violation of the defendant's procedure, and she received verbal counseling. (Def. Ex. M.)

On April 12, 2010, the plaintiff received a reprimand for failing to comply with instructions from management. (Def. Ex. N.) The plaintiff turned on service for a customer when the section manager specifically instructed the plaintiff not to turn on the service. *Id.* On April 12, 2010, the plaintiff and her supervisor, Mullen Mitchell, held her combined 30-day and midyear performance reviews. (Def. Ex. O.) The plaintiff made little progress on her assigned SMART goals, and although she met minimum expectations, much improvement was needed in the noted areas. *Id*.

On May 5, 2010, the plaintiff received a written reprimand for mishandling funds and incorrect account cash balances. (Def. Ex. Q.) Specifically, she showed $2,997.00 as the received amount instead of the correct amount of $3,179.00. *Id*. Upon review, the defendant discovered the plaintiff failed to post a $202 cash payment to any account. *Id*. On June 1, 2010, Mitchell conducted the plaintiff's 60-day performance review. (Def. Ex. R.) The defendant has put forward evidence that, although the plaintiff improved in some areas, her overall results did not improve significantly enough to meet expectations. *Id*. In June 2010, the plaintiff continued to be reprimanded for failing to follow procedure. (Def. Ex. S.)

On July 28, 2010, the plaintiff is alleged to have mishandled another cash payment. (Def. Ex. U.) The plaintiff's till audit did not discover a till discrepancy. *Id*. Her supervisor's till audit revealed that the plaintiff, instead of applying $110 to a customer's account, only applied $65. *Id.* She also allegedly failed to apply $45 cash payment to a customer's account.

In sum, over the six months after the plaintiff was placed on a developmental plan to help improve her performance, there is evidence that she was counseled at least six

11

times for failing to follow proper procedure, including the mishandling of customer payments.

In response, the plaintiff argues that from 2007 until her employment was terminated, she was repeatedly and wrongly disciplined and ultimately terminated for alleged performance issues. (Pl. Dep. at 76-84; 97-101; Wrench Aff. ¶¶ 5, 7-13.). The plaintiff emphasizes that Evelyn Ferguson, Lucas Raymond, and Mullen-Mitchell, all African American supervisors, issued various types of discipline to the plaintiff and other white employees. *Id*.; (Harrison Dep. at 55-93). In 2007, the plaintiff was suspended for five days without pay for participating in only three misery calls over the span of ten months' time. (Wrench Aff. ¶ 5(b); Pl. Dep. at 32.)  A "misery call" occurs when a customer service representative does not attempt to resolve the customer's request. (Wrench Aff., ¶ 5(b); Ferguson Dep. at 37-38.)  The plaintiff complains that she was then transferred from Wrench's supervision for insubordination but while Wrench was out of the office due to an injury. (Wrench Aff. ¶ 11) (emphasis added).  She also claims that once, while at the North Area Office, she was ridiculed for speaking during meetings and placed on a performance plan for cash tiller calculations that were merely simple human errors. (Pl. Dep. 109-114.) The plaintiff complains that she was also required to perform extra duties after her transfer that other employees were not required to do, such as complete a job manual.  (Pl. Dep. at 76-84.)

The plaintiff also offers, as evidence of the defendant's racial animus, the defendant's decision not to discipline Tamme' Nathan, an African American customer service representative, for engaging in similar prohibited conduct the plaintiff allegedly engaged in. (Wrench Aff. ¶ 5(b).).  In November of 2007, Nathan, employed by the defendant as a customer service representative in the call center, participated in seven "misery calls" with the defendant's customers, even allowing calls to drop to dead air time. *Id*.  Notwithstanding, Nathan was only issued a Memorandum of Understanding without any

12

other action taken. *Id*.  Wrench, Nathan's supervisor, claims to have issued the memorandum at the instruction of her African American supervisors, Ferguson and Lucas Raymond. *Id*.  Similarly, the plaintiff offers that a Lawshana Ford and Lovella Lee, two other African American call center employees, participated in misery calls around that same time but were only issued a memorandum. *Id*.

By way of comparison, the plaintiff was accused of engaging in only three misery calls in a ten month period.  And, although Nathan, Lee, Ford, and the plaintiff all engaged in misery calls, the plaintiff was the only one suspended without pay for five days.  The plaintiff believes that she "has presented circumstantial evidence demonstrating she engaged in unsatisfactory conduct similar to that of Ms. Nathan, Ms. Lee, and Ms. Ford, all African American customer service representatives and that disciplinary measures enforced against the Plaintiff were more severe than those enforced against Ms. Nathan, Ms. Lee, and Ms. Ford."  (Pl. Resp. at 14.)

There are various problems with the plaintiff's proffer.  First, the plaintiff has not tailored her arguments to the elements at issue.  And, although such failure of semantics is not fatal, it increases the degree of difficulty in the Court's task.  Second, and relatedly, the plaintiff does not actually address whether she was meeting the legitimate work expectations of her employer, in the defendant.  Of all the performance deficiencies alleged above, she essentially rejoins one – the misery calls.  But, even with respect to such calls, the plaintiff does not *deny* them.  Rather, she simply skips to the argument in relativity – that her sins were less than those of similarly situated individuals, an element-four inquiry.  Said again, the plaintiff has not taken the time to really refute a single allegation of performance deficiency.  Even a cursory perusal of her deposition testimony, or the record generally, makes plain that she has *excuse* for some of the alleged deficiency.  But, nowhere in her legal presentation on motion has she attempted to say that this characterization of her work was somehow fundamentally untrue such that she could, in reality, be considered to have

13

been meeting her employer's legitimate work expectations. This is a problem lethal to her *prima facie* case.

Where the plaintiff does more work is with respect to the fourth element, however specifically framed. As stated, the Court is generally open to evidence that similarly situated employees outside the protected class received more favorable treatment. *See White*, 375 F.3d at 295. And, the Court would have been be amenable to recommending that a strong showing of disparate disciplinary treatment between the plaintiff and African American employees might be suggestive that both the third and fourth elements were somehow effectively satisfied. But, even here, the plaintiff's evidence seems insufficient.

This District has indicated that a "plaintiff must establish that 'other employees' were similarly situated in all relevant respects; that they 'dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *See Ward v. City of North Myrtle Beach*, 457 F. Supp. 2d 625 (D.S.C. 2006). Although the undersigned believes that the fourth element is slightly more flexible in its demands, the Court will generally evaluate whether, under this view, Nathan, Lee, and Ford are reasonable comparators. *See White*, LLC, 375 F.3d at 295.

It seems unlikely that they could be. First, the plaintiff draws comparison to them on the basis of one performance deficiency - misery calls. The defendant, however, has enumerated many others, as described in detail above and outlined in her termination letter (Def. Ex. B). So, even if the plaintiff was somehow similarly situated to other employees for purposes of this one performance aspect, her conduct is entirely distinguishable otherwise. The plaintiff has not attempted to characterize any other employee as having

14

a similar constellation of performance deficiencies and yet was not terminated.[1]  They may have; she has not shown it.  This seems essential.

And, second, even if the Court were to focus on the comparability of the plaintiff's experience in misery calls to that of others, the plaintiff is not litigating her suspension for them.  She has exhausted and pled only a discriminatory discharge claim.  There is no way for her to bootstrap some consideration of her entire performance history, however inaccurately portrayed, to that of other employees, on the strength of the misery calls alone.

It is important to note that the plaintiff also accuses the defendant of intentionally searching her work files and phone logs, in November 2007, to find any reason to "pick [the Plaintiff] off [from her job]."  (Wrench Aff. ¶¶ 5(b), 8.)  The plaintiff claims that the defendant did not go through the files of African American employees, accused of engaging in misery calls, to "pick them off."  *Id.*

This is the kind of accusation that might begin to approximate sufficiently strong circumstantial evidence of improper considerations, on its own, such that *McDonnnel Douglas,* itself, becomes unnecessary.  *See Diamond*, 416 F.3d at 318.  The problem , however, is that, to the extent true, such "picking off" occurred *three years* prior to the termination of the plaintiff's employment and relates exclusively to the issue of misery calls.  (See Wrench Aff. ¶¶ 5(b), 8.)  And, while it might be probative of her mistreatment with respect to the plaintiff's five day suspension, she has not exhausted or pled any such claim. Her claim is for the discharge.  And, where it might be probative evidence of mistreatment at that time, the Court cannot imagine allowing a jury to use that remote piece of evidence to draw conclusions about an adverse employment action occurring three years later and

---

[1]  Indeed, there is some evidence that in certain aspects she was treated no differently for comparable conduct.  The plaintiff, an unidentified Mr. Tolbert, and an unidentified Ms. Torres all received less-than-satisfactory ratings on their SMART goals from Mitchell for the 11/1/08–10/31/09 performance review rating period. (Talent Dep. at 119.)  And, the plaintiff concedes that no associate who received less than a satisfactory performance review received a pay increase or year-end bonus. (Pl. Dep. at 177-178.)  The plaintiff has, of course, offered evidence that precisely these two individuals were differently treated for other comparable conduct.  (Pl. Dep. at 198-201.)

based on numerous other alleged performance violations. (See Def. Ex. B.) The counter, obviously, is that her 2007 suspension was included in the litany of offenses enumerated in her termination letter. *Id.* But, the issue is not whether the defendant may have targeted the plaintiff in 2007 but whether issues of fact about that past targeting can be reasonably viewed as extending over a three year expanse, until her termination, without some additional evidence that it potentially might have continued over that time. The plaintiff would plainly say that the many other disciplinary events she suffered would constitute a straight line between the events – the 2007 targeting and the termination of her employment. But, as discussed, the plaintiff has not really made any effort to refute the substance of the performance accusations against her. They stand largely as justified. And, no other comparator has been identified with the same panoply of alleged offenses.

The district court might reasonably disagree. But, the undersigned would be hesitant to recommend that the plaintiff could make out a prima facie case.

### *Legitimate Non-Discriminatory Reason and Pretext*

The parties have essentially volleyed these same arguments, again, with respect to the pretext portion of *McDonnell Douglas*. The defendant has obviously proffered the work deficiencies of the plaintiff. "Job performance and relative employee qualifications [are] widely recognized as valid, non-discriminatory bas[i]s for any adverse employment decision." *Evans v. Technologies Applications & Service Co.*, 80 F.3d 954, 960 (4th Cir. 1996); *see also Mackey v. Shalala*, 360 F.3d 463, 468 (4th Cir. 2004); *Karpel v. Inova Health System Services*, 134 F.3d 1222, 1229 (4th Cir. 1998). The plaintiff does not offer anything new by way of the falsity of the defendant's explanation except to reiterate the disparity of treatment. The Court has already rejected this line of reasoning as insufficient for the want of a reasonable comparator.

The plaintiff has not created any issue of fact as to whether or not the defendant really believed the plaintiff's work was deficient such that termination was warranted.

16

The undersigned would not recommend that the plaintiff's discriminatory discharge claim should proceed.

## III.   Hostile Work Environment Claim

Lastly, the defendant has moved for dismissal of the plaintiff's hostile work environment claim.  As with the retaliation one, it is hard to make out a pled claim for hostile work environment from the Complaint.  The plaintiff says once, "[T]he discriminatory actions . . . against the plaintiff, created such a hostile work environment."  (Compl. ¶ 11.)  No specific element of the claim is averred, otherwise.  The Court would consider it some, even sitll.  To establish a hostile work environment claim, the plaintiff must prove by a preponderance of the evidence that she was subjected to (1) unwelcome harassment; (2) based on her race; (3) that is sufficiently severe or pervasive to alter the conditions of his employment and create an abusive atmosphere; and (4) that is imputable to the defendant. *See  EEOC v. Cent. Wholesalers, Inc*., 573 F.3d 167, 175 (4th Cir.2009).

### *Severe or pervasive*

The "severe or pervasive" element of a hostile work environment claim "has both subjective and objective components." *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333 (4th Cir. 2003) (en banc).  First, the plaintiff must show that she "subjectively perceive[d] the environment to be abusive." *Harris v. Forklift Systems, Inc*., 510 U.S. 17, 21-22 (1993).  Next, the plaintiff must demonstrate that the conduct was such that "a reasonable person in the plaintiff's position" would have found the environment objectively hostile or abusive. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81-82 (1998).

It is not entirely clear whether the plaintiff has even created issues of fact exist as to her own subjective impression – that she perceived herself as having been severley harassed.  But, for now, the Court would presume it.

As to the objective severity of the harassment, however, the plaintiff cannot make the requisite showing.  Objective severity "should be judged from the perspective of a

17

reasonable person in the plaintiff's position, considering 'all the circumstances,'" giving "careful consideration of the social context in which particular behavior occurs and is experienced by its target." *Oncale*, 523 U.S. at 81; *see also Harris*, 510 U.S. at 23 (warning whether a hostile environment actually existed "can be determined only by looking at all the circumstances"). "There is no mathematically precise test" for determining when a hostile or abusive work environment exists. *Harris*, 510 U.S. at 22. The circumstances that should be considered include: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with an employee's work performance. *Harris*, 510 U.S. at 23; *see also EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008). But, "'no single factor is' dispositive." *Sunbelt*, 521 F.3d at 315 (quoting *Harris*, 510 U.S. at 23).

In order to be actionable, the harassing "conduct must be [so] extreme [as] to amount to a change in the terms and conditions of employment." *Id*. (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). The Fourth Circuit has "recognized that plaintiffs must clear a high bar in order to satisfy the severe or pervasive test." *Id*. It has stated, therefore, that the "task then on summary judgment is to identify situations that a reasonable jury might find . . . instances where the environment was pervaded with discriminatory conduct 'aimed to humiliate, ridicule, or intimidate,' thereby creating an abusive atmosphere." *Id*. (quoting *Jennings v. Univ. of North Carolina*, 482 F.3d 686, 695 (4th Cir. 2007). "[W]hether harassment was sufficiently severe or pervasive to create a hostile work environment is 'quintessentially a question of fact' for the jury." *Conner v. Schrader-Bridgeport Int'l, Inc.*, 227 F.3d 179, 199-200 (4th Cir. 2000) (quoting *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 243 (4th Cir. 2000)).

The plaintiff has complained about a work suspension, performance reviews, disparities in workload, vacation days, and a transfer. But, the plaintiff has not presented

18

any evidence that her work environment was somehow permeated with the outrageous discriminatory intimidation, ridicule, and insult that is required. Even accepted in their totality and with every severity credited in the plaintiff's favor, these incidents do not meet the objective standard. The allegations contain no evidence of racially threatening or humiliating or abusive behavior. She was treated differently, at best. But, courts have repeatedly held that such job-duty-related disparities and grievances are not of the kind of severity the claim contemplates. *See Fleming v. MaxMara USA, Inc.*, 371 Fed. App'x 115, 119 (2d Cir. 2010) (finding that excluding employee from meetings and criticizing employee's work did not support hostile work environment claim); *Patton v. Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 339 (7th Cir.2002) (finding that supervisor's "rude, abrupt, and arrogant" behavior and "stern and severe criticism" did not support employee's hostile work environment claim); *Cole v. Hillside Family of Agencies, Inc.*, 2011 WL 2413928, at *7 (D. Md. June 9, 2011) (finding that being forced to work without pay, being forced to redo assignments, being denied professional development opportunities, unjustifiably removing job duties, and isolating from co-workers is not sufficiently severe and pervasive for a hostile work environment claim)*; Myers v. Md. Auto. Ins. Fund*, 2010 WL 3120070, at *6 (D. Md. Aug.9, 2010) (finding that allegations of employer micro-managing, harassing, and belittling employee was unwelcome but not severe and pervasive). These allegations simply do not meet the "high bar" established by the Fourth Circuit.

At best, the plaintiff may have identified discrete acts of discrimination, long ago abandoned, but such acts of discrimination "cannot be transformed, without more, into a hostile work environment claim." *Kilby–Robb v. Spellings*, 522 F.Supp.2d 148, 164 (D.D.C.2007). They are not based on "severe and pervasive discriminatory intimidation or insult." *Lester v. Natsios*, 290 F. Supp.2d 11, 33 (D.D.C.2003). The plaintiff has complained of workload and style disparity not racially abusive conduct. *See Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745, 753 (4th Cir.1996) (working environment must be

19

"hostile or deeply repugnant," not "merely unpleasant," to be actionable).  The plaintiff cannot fold into a hostile work environment claim these prior discrete acts of alleged discrimination, which she could have separately contested.

The claim should also be dismissed.

## **CONCLUSION AND RECOMMENDATION**

Wherefore, based upon the foregoing, it is RECOMMENDED that the defendant's motion for summary judgment [Doc. 34] should be GRANTED.

s/Bruce H. Hendricks
United States Magistrate Judge

February 21, 2014
Charleston, South Carolina

20

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. **Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.** "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

**Robin L. Blume, Clerk**
**United States District Court**
**Post Office Box 835**
**Charleston, South Carolina 29402**

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).